## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

PARKER MICHAEL KNIGHT,                    3:13-CV-01211-BR

     PLAINTIFF,

V.                                                         AMENDMENT TO CURE
                                                              DEFICIENCIES

DEPARTMENT OF THE ARMY,

     DEFENDANT.


PARKER MICHAEL KNIGHT
45 S.E. 196TH AVENUE
PORTLAND, OR 97233
(971) 400-4609

     PLAINTIFF, PRO SE

On July 1, 2013, Plaintiff filed a pro se complaint in Multnomah County Circuit Court in which he alleged he served in the United States Army from January 31, 2002, through September 18, 2007, under the name Hyunseok Michael Oh.

Plaintiff, Parker Michael Knight, was born and given Hyunseok Oh, immigrated to USA from South Korea in 1989; became naturalized U.S. Citizen and joined U.S. Army after 9/11 NYC Attack. Plaintiff added middle name Michael when he became U.S. Citizen and officially, legally used name Hyunseok Michael Oh. After relieved of U.S. Army duties and getting out of the Army, Plaintiff married a woman from California, where Plaintiff and Woman resided together in Washington County of State of Oregon, where, Plaintiff, changed name at the marriage ceremony in front of a Judge, who granted last name change from OH to KNIGHT. Then, Plaintiff went to Washington County Probate Court in City of Hillsboro, Oregon, to have it legally name changed from Hyunseok to Parker. Plaintiff became legally, officially, Parker Michael Knight. Plaintiff's US Passport Driver's License has been updated as new name and all rights retained. Parker Michael Knight was Hyunseok Michael Oh.

Of many administrative claims, Plaintiff filed with U.S. Army, while Plaintiff was in the Army as a soldier or out of the army as civilian person, Plaintiff made effort to exhaust all administrative claims processes.

Plaintiff filed an administrative claim at the end, which was the last of last administrative claim that he can file with Department of the Army. Then the Army denied an administrative claim in writing recently for which Plaintiff started the processes, which begun in Combat Zone, in Iraq, between 2004-2005 for most severe case of Plaintiff suffering.

1) When Plaintiff was molested, tortured, hazed, beaten, Plaintiff filed EO complaint, which is an administrative complaint procedure by Army Equal Opportunity Complaint form DA Form 7279-R under Army Regulation 690-600, Equal Opportunity Employment Discrimination Complaints provides further guidance.

2) Department of the Army policy to provide equal employment opportunity to all soldiers and DA civilians under applicable EEO laws and regulations. These laws and regulations include Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Rehabilitation Act, and AR 690-600.

EO Complaint is filed with US Army JAG Lawyers in the Combat Zone, and reported through Chain of Command, First Lieutenant, then reported to Company Commander. Company Commander asked hearing where Plaintiff and two of three primary offenders were brought in for questioning. Offenders were primarily three E-5 Sergeant Non-Commissioned Officers, and all-three are direct supervisors when Plaintiff's Plantoon assigned duties in teams, three E-5 Sergeants acted as shift managers while Plaintiff was E-4 Specialist who took shift as shift worker who majority of times worked in double or triple shift in single day.

In Combat Zone, Army operated in some units thinned out personnel assigned to vast area for combat support operation. Basically, personnel is short-manned and only way to fill the gap was to run shifts of 16-hours shift or 24-hours shift to soldiers. Army said, by mandate of human treatment requirement, soldiers have to sleep 4 hours per day at minimum. However, Army was not given when a

soldier should sleep. So, therefore, Army allowed Commanders to make decisions. Commanders in turn allowed Supervisors of Non-Commissioned Officers to make decisions for Commander in supervising sleep, training, eating, and mission.

Three E-5 Sergeants and Three E-4 Specialist soldiers were located at Baghdad Iraq Airport Combat Mission Support team to operate a site where internet data is repeated through Microwave Transmissions System from main node of internet connectivity through Satellite Communications Systems at the Brigade location in Airport.

Web of links operated by Microwave Transmissions Systems pushes the small units of six to ten personnel out to locations away from main unit. The Supervisors operate the three to five soldiers through shift work and provide them with food and water delivery for lunch so their work can continue a double shift length of time.

Soldier operates and mans or sitting inside a communication box which is the size of chair and a soldier can sit in with fully armed weapon and combat armor system. With gear wearing on soldier, the interior of the communication container which is made of highly explosive magnesium for lighter weight as well as instant destruction capability so it would not fall into enemy's hand for any military secret should any equipment or unit gets over-run by enemy forces.

A soldier operating this communication box which sits on top of Humvee or High mobility multipurpose wheeled vehicle (HMMWV), did not receive a break from duty until 16 hours or more has passed due to thinned out operation of personnel available.

During this change of shift, E-5 Sergeant would bring food in forms of plate of meal from Mass Hall operated by the Company Level about several miles away through convoy. Company Level location also is location where they would receive fuels and logistic supplies for replacement parts for the Iraq Operation for combat support. Many of those equipment fails as any electronic equipment failure comes from are Heat, Dust, and Cooling issues.

Heat inside the communication box is upward of 130 degrees. During operation times of day or night, communication box has to be closed in order to be invisible to enemy any flickering lights inside the communication box. This contains several light flashing signal operation equipment meant to operate in extreme conditions. This box contains two blowers meant to work to prevent multi-failure of heat vent. This box contains dust filter which gets clogged up with dust to let in cool air attached to the door panel meant to screen out debris and bugs. Fine dust still manage to get inside the communication box through means of attached to soldier or equipment or shoes. The communication box gets cleaned by dusting using dust hand broom by soldier in the shift operation.

As, said, soldier does not receive break for shift operation, usually, soldier is operating the vehicle's diesel generator to provide power to the communication box from several feet away which runs highly noise level which eventually will deteriate the operator ear-drum or cause hearing aches or Tinnitus "ringing" as perception of sound within the human ear when no actual sound is present.

Heat, and loud noise are present when person is operating this type of equipment and sleep deprivation.

When a soldier is relieved by next shift personnel on 16 to 24 hour shift operation, that relieved soldier is not immediately returned to quarters for sleep. The relieved soldier remain at work, just not operating 16 hours shift on the communication box, and thus, semi-satisfying humane treatment to be relieved from duty for relief. The soldier, Plaintiff, had been supervised by one of three or sometimes by all three Supervisors to go on a convoy to pick up fuel for the shelter housing where rotating soldiers stay, sleep, live, reside, during those operation in Iraq to operate those communication box. Fuel comes from fuel-run mission to the Company Level location via Humvee several miles away. Humvee has maximum speed limit gauge of 55 mph. It can exceed the speed limit if driven beyond the limit by forcing accelerator even after gauge has reached the 55 mph speed. Often, short convoy run was accorded by mandate of the Company and Brigade Commander's general order to drive as fast as you can without making allot of noise, even turning off headlights unless necessary to do so to have stealth over safety.

Safety was often negotiable and was not on priority because chances of safety is negligible and allowed to be bent because often Safety goes in hand in hand with life and death situations.

A soldier, Plaintiff, is constantly in life and death situations, first of all, magnesium box is highly explosive. Magnesium metal and its alloys are explosive hazards; they are highly flammable in their pure form when molten or in powder or ribbon form. Entire exterior of the communication box is made of Magensium Alloys for instant incineration if area of operation gets over-run with enemy forces to destroy sensitive data regardless however importance of human life may be.

PTSD is Post Traumatic Stress Disorder. Death of soldiers nearby, scene of gruesome war zone of desolate desert country of Iraq, destroyed buildings, and dead bodies on the ground, emptiness, and constant bombing at night time by enemy forces of unknown location cause the PTSD. It happens and happened to Plaintiff as well; unable to cope and not having time to heal, the effects of PTSD accumulates inside person's mind. In general, the death by suicide bomber wearing IED – improvised explosive device, vest is real. Death by IED device on the street or walkway or alley is real. Sniper attack while patrolling and walking is real. Hissing noises of bullet passing nearby, bombs falling and making whistling noise is real. Blast radius which is almost for-sure death area of fallen rockets and mortar attacks are real. Interior of the base may be walled by concrete walls to prevent stray bullets from killing soldiers attempting to operate a base where Corps, Division operates, a units of brigade and battalion and company level operation is held away from the tank armored corp protection using a strategic location from where likely enemy will attack, the main base rather than smaller base location where strategically spread out man power and equipment has less chance of catastrophic failure due to massive single blast.

Operating heavy machinery under fire gives enemy big targets. Therefore, most of the grunt works are done by man-power. Most equipment like radios and cable rolls weigh more than single man power can handle. Radios can weigh 80 lbs on average. Cable roll weigh 200 lbs. Tower can weigh 150 lbs without tools and attachment and microwave dish. Sandbags stacked can weigh 60 lbs each bag and hundreds are required to fortify single location like a window to prevent bullets

from penetrating and killing soldiers behind the window or thin constructed wall like plywood.

When first days Plaintiff landed in Kuwait, vehicles Humvee did not have armor put on. Humvee did not have structural armor. The Humvee was covered with vinyl canvas with plastic see-through zip up window area where you can pull down on the zipper to open the window to allow air to breath inside the humvee driver's cabin area. It's tight and confined space, where a soldier, Plaintiff, wearing a body armor and weapon on hand, can barely fit inside, very snuggly and very tightly at times. It contains additional cabin radio and other instrument like chemical warfare protective gears like breathing mask filters and ammo cans, box of Meal Ready to Eat (MRE).

Humvee is basically made of aluminum exterior to lighten the vehicle weight to reduce fuel usage during operation. Mainly, Army's point is to lighten the weight which compromises integrity or safety of operator, Soldier, Plaintiff's for mobility with amount of weight vehicle has to carry. In Plaintiff's case, Humvee carried communication box, which weighed several thousand pounds. Because, when deploying to Kuwait, soldiers were ordered by commander to fill the truck with as much assortment of equipment as possible inside the communication box. When vehicles were driven up North from Kuwait to Iraq under the night, vehicles were so heavy, that safety was bargained with, and many vehicles like 5-tons trucks and several humvee lost entire rear axle or rear tires where extra weight was put on and became completely disabled on the highway. Several soldiers fell asleep while

driving from exhausting of heat and sleep deprivation. Several vehicles and operators of those vehicles rolled off the highway into the ditches.

Vehicles were stranded with rear Axle fallen off and not readily available with spare rear axle, vehicles became stranded and towed by local forces to staging bases far and near South of Baghdad Airport Operation Base.

When arrived at the base, the Plaintiff's unit lived in tents, and flooded with water from rain and equipment became soaked and moldy. When a unit operating in Iraq leaves after a year to two years of combat operation, a relieving unit takes over the compounds and facility and write-off signing papers for inventory of equipment that gets left behind occurs and newly arriving unit takes over the location and facility left behind by the earlier unit returning to U.S. Soil.

After several months since Kuwait landing, Plaintiff gets situated in a brick wall house next to Special Forces Combat Operation Unit's compounds to support their telecommunications needs as Microwave Transmission Systems Operator, rank of E-4 Specialist with three Supervisors who were E-5 Sergeant NCO (Non Commissioned Officer), and several other E-4 Specialist soldiers who worked along side with Plaintiff.

Combat Zone torture began with the small detachment operating the support role near Special Forces unit in Iraq.

In favor of unit that supports Special Forces, the S.F. unit provided gears like HE grenade to three sergeants. A box full of presents. First night, the sergeants walked around inside the house Plaintiff resided too, as well as three sergeants and

other specialists. Sergeant is shortened with SGT. Specialist rank is shortened with SPC.

A communications related, combat support unit does not get involved in actual combat. Soldiers of such unit in the Army receive limited ammunition for M-16-A2 rifle, which is similarly AR-15 rifles with full-auto capability with modified air cooling grips and modified upgrades to weapon makes M-16-A2 designation. Each soldier received from weapon armorer, 300 rounds of 5.56 mm NATO rounds for their M-16-A2 (shortened hereon as M16).

300 rounds of ammo is accounted responsibility by each unit's Commander. Unused ammo must be accounted as well as used ammo's cartridges. Commander's responsibility lies within those accountabilities of inventory of equipment, personnel and management of resources.

300 rounds per person never reached Kuwait. Nor did the 30 rounds magazines to put them in. Unit armorer was negligent and ultimately accountability overseen by Commander, Captain Elaine Freeman, a female officer. Unit supply technician was a female who recently replaced a male supply technician during last few months prior to the deployment, which allowed error to occur without any bias on gender from Plaintiff's part. Only being stated to identify them to Plaintiff's knowledge.

Because, the unit was missing ammo rounds for soldiers' weapons and magazines never made arrived, Commander had to make purchase order to get new supplies.

Plaintiff, and many soldiers arrived with extra magazines that they purchased from civilian sources outside of Fort Hood Texas base to supplement the units' lack of supplies, foreseeing such error were common in combat zone, with keen insight to how much safety was being bent, to provide extra safety measures to each by themselves. Brought their own extra gears.

Plaintiff, for one purchased over 60 magazines from military surplus store and carried it with him to Kuwait.

Other soldiers brought Xbox game console with television as extra luggage allowed to each soldier. Such was common as when arrived there were several dozen game consoles available for soldiers to have tournament to play on.

Only substances now allowed in Iraq was, personal firearm or personal supply of ammo, alcohol and pornography like Playboy Magazines and videos of pornographic materials. It was forbidden by the General Order by the highest ranking military officer of the Iraq Operation, decreed with heavy punishment to have pornographic materials or consumption of alcohol or trafficking. Also, other forms of illegal drugs were not allowed in Iraq nor in US Soil.

Route to which vice arrived are scant and unknown, but vice became wide spread and either hushed because high ranking officer was involved and therefore, retaliation, and Army culture in general retaliates heavily against those who speaks out. Any whistleblower will be punished retaliated for claims of molestation, rape, adultery against any military personnel; which often, Commanding General of the Base would overturn a military justice trial conviction based on absolute power put on the military commanding general of operation or base.

Many victims, who reported such crimes, would remain in within same unit or same team with the person who committed the crimes, and is not allowed to transfer out or change job shifts until without commander's discretion or authority.

Many cases, person with power, even the Commander of a company level unit became the offender of such indiscretion and impregnate enlisted female soldier into sexual slavery on Iraq Operation, even within same Battalion as Plaintiff, and Plaintiff was aware of activities, and could not speak out, and factually, the commander was relieved of command and female enlisted soldier who became pregnant was sent back to US Soil.

There is a rule which female soldier who becomes pregnant in combat zone is immediately relieved of duty and sent back to the US Soil to give birth and remain there to take care of the child.

Many units lose soldiers this way in combat zone. To prevent this, Commanding General decreed forbidding sexual activities in combat zone altogether in early 2004. Soon, the Iraq Forward Operation Base in Baghdad Iraq, with female soldiers in units operated prostitution to receive cash $US Dollars, alcohol, favors, drugs like marijuana or hashes locally available outside the base from Iraqi merchants on the markets of Baghdad City, Iraq.

There was a scandal of sort which several NCO (Non commissioned officers) and Officers and Enlisted soldiers appeared on video seized and reported.

Plaintiff, in person, seen, Captains rank army officer drinking vodka obtained from Commissary Exchange. Alcohol was not permitted for consumption by Army soldiers or any military personnel in Iraq, at least based on the decreed rule with

punishment of reduction of pay and rank. Commissary Exchange would not sell directly to the army officer which was available in small bottles. Those were available for green zone soldiers of other national country units. The civilian workers who were contractors were allowed purchases.

Many of the defense contractors also took in sexual partners from female soldiers deployed to Iraq whom they worked alongside with each other. The soldiers became pregnant, many of which they did so to cope with the combat zone stress, and to escape safety out of deadly combat zone experiences. Many women were sexually assaulted in combat zone and there were limited and limits to how to report the battery and rape to unit commander who were put on charge of investigation and disposition including assignment of personnel to transfer or shift changes.

Most units deployed with just enough unit to operate, and with loss of unit soldiers such as cook or mechanic who were female that gets pregnant and had to leave the combat zone, a non-cook or mechanic has to fill in the gap. As those things happened allot and loss of unit soldiers due to combat injury increased and effectiveness of unit is decreased. Thus, resulting in increased man-hours without relief occurred, and less oversight of unit's supervisors from higher ranking supervisors with more insight and wisdom and experience.

By June 2004, some soldiers left the unit and returned US Soil for extended period beyond the Jan 2005 return date. Units were assigned regardless of unit's number of soldiers, tasked as it was before, by higher units to complete the mission.

Plaintiff was already sleep deprived from reacting to nightly bombardment of rockets or missiles and small arms (enemy weapons consisting of AK-47 style rifles, Rocket Propelled Grenades) and mortar attacks nightly into the main compounds and nearby. Those attacks that delivers explosive devices on an arch or curve are not as accurate when enemy is unable to see where explosion occurs or lands due to high rise concrete barriers setup around main base in Baghdad. Buildings obscure visual data at night even with use of tracer rounds. Because, the flash of light is too visible and distant is hard to judge, many of the explosion did not actually kill as many US soldiers than daytime Improvised Explosive Device exploding under the moving vehicle or near wall or from trash debris fallen along the road.

Daily, main base checks incoming personnel who works for the base operation to operate water delivery trucks from outside base where water is sourced to deliver to inside base by local Iraqi residents who were screened and background checked for non-enemy affiliation; to work inside the base with real $ US dollars as payment. Those were one of Special Forces' operations to increase economic activities in the neighboring cities and thus create better assistance with locals on reporting suspicious activities by enemy forces, Taliban operatives burying IED into the road or highway at the cover of the night.

Always, there're risks and safety issues. Operations slow if too much safety cautions are taken. However, after mass hall inside the forward operation base was attacked by suicide bomber wearing explosive vest past the screening check point the screening of Iraqi workers intensified.

Standing kill order was to shoot anyone operating passenger vehicle inside the walls of forward operating base without escort of US Soldier sitting next the driver. As a duty of soldier guarding inside the walls of forward operation base, part of the duties were to supervise workers who got passed the check point and were screened and background checked, and move them around to their designated work sites.

When Plaintiff reported to the unit of sexual assault, molestation, and torture to the EO Complaint Officer who was Company Level 1st Lieutenant, Company Commander asked the Plaintiff and three other sergeants to appear before her. However, one of the offender of torture has gone missing in US Soil during his 6 months mid-tour vacation for two weeks and became AWOL (Away without Offical Leave). He was a Native Indian with several children and when he returned he did not return back to the unit and disappeared into Indian Reservation. Appearance was made by a SGT, Commander, and high ranking NCO above SGT level in closed door without any other witnesses. Company commander made decision and decreed that SPC Oh, Plaintiff, to transfer out of the small team operating, and put on suicide watch due to his condition, and remove all of this ammunition, magazine, and personal protection, and to be put on a different duties at least several miles away from offenders. At the time Plaintiff was with 2nd Plantoon of Bravo Company 3rd Signal Brigade, III Armored Corp operating out of Fort Hood Texas, which deployed to Operation Iraqi Freedom II during 2004-2005 period in Baghdad Iraq for combat support missions around Baghdad Airport. In effect, Company Commander transferred Plaintiff from 2nd Platoon to 1st Platoon. 2nd Platoon

operated in outskirts of desolate areas of main airport activities area. 1st Platoon operated inside main airport activities area near and supporting within Forward Operating Base.

Plaintiff, was removed of firing pin of M-16-A2, which in effect disabled the weapon capability and became a "Toy" or "relic" and removed of all 300 rounds of 5.56mm NATO rounds for M-16-A2.

In Combat Zone, a soldier without weapon is ineffective fighter.

Afterward, Plaintiff was delivered to a housing location, while Company Commander sealed the case and reasons behind transfer of Plaintiff to anyone else in the Company Level unit, and forbid talking about it, with punishment of rank reduction and pay reduction if disobeyed.

Plaintiff, began talking about it after leaving Iraq War Zone, while in the US Army, because, order remained in effect until Company Commander who ordered it changed unit and left Bravo Company.

In Iraq, Plaintiff filed EO Complaint against, and JAG investigated, the process, which was allowed, was put on hold when Plaintiff was transferred to outside JAG location. Whistleblowers get bad treatment because in a way it affects the smooth operation of military missions. It puts a wrench in it. Unless actions of those offenders puts a wrench in the well oiled machine, unit chain of command ignores the facts of torture, molestation, assault, rape, use of alcohol, drug use, possession of pornography hidden from Company Commander and try to resolve it under the Non-Commissioned Officer team's members those who are E-5 to E-7 in Company Level.

Enlisted soldier who wrote to Senator or Governor or Congressman without notifying the chain of command including NCO and Officers level are retaliated. Their promotions denied, their job re-assigned or given desk duties or assigned special duties to have the soldier removed away from their main duties of job qualification. MOS which stands for Military Occupation Specialty; is a code that provides how a soldier gets promoted to higher rank. From E-1 to E-4 soldier is not NCO. From E-5 to E-8, NCO chain of command is established to support the Officer Chain of command to operate the supervision of E-1 through E-4 ranks which is majority of the forces in military personnel system.

Plaintiff wrote to Senators during June 2004 when Plaintiff returned to US Soil for mid-tour two weeks vacation to Fort Hood Texas. Wrote letters to US Senators and sought help from them. Unit in the US Soil side (CONUS) retaliated by threat of punishment and accused of Plaintiff of AWOL, disobey of order to return to combat zone in which the unit overseas has approved of extra weeks to prepare for lawsuit filed by estranged spouse, divorce lawsuit in Texas and when Plaintiff arrived in US Soil in Texas, was served on the day of arrival by process server. Spouse became pregnant while Plaintiff was in Kuwait and Iraq and lawsuit asks that Plaintiff's spouse divorce Plaintiff and receive spousal cash monthly support, and baby was born and Spouse in 2004 in the lawsuit portrayed the baby was Plaintiff's. Later, on 3rd Hearing in Iraq, Plaintiff proved Spouse has committed perjury and lied to the court in lawsuit, and baby was not Plaintiff's child. Spouse had adultery and became pregnant and did not tell Plaintiff and gave birth full term while Plaintiff was in Iraq. Thus, extra expense occurred was not reported to

Plaintiff and that created spouse to sell off personal properties and marital properties without Plaintiff's knowledge including furniture, appliance, cars, and house. In which cars and house were not sold due to requiring Plaintiff's signature and knowledge. Spouse created several credit cards without Plaintiff's authority using Plaintiff's social security number that later became Spouse's restitution upon result of the case which Spouse was not granted spousal support, no child support, and no car or house division awarded to the spouse. Upon return to Iraq after 2nd hearing in July 2004 in US Soil, Plaintiff returned to unit operation with 1st Platoon and put on psychological and medical care to be treated for Chronic Depression.

Plaintiff suffered, heat exhaustion, heat stroke, and weather based frost bite and cold injuries. Several times, Plaintiff suffered back pain due to trauma several times, because, short-manned, Army forced upon Plaintiff to labor to make mission while putting Plaintiff in improper unsafety conditions which had many possibilities end result could have been death. Plaintiff protested about the bad conditions and with Medical Doctor's orders after injuries. Army forced Plaintiff to pass over Promotional opportunities.

Plaintiff, who graduated from 4 year college education and received Bachelor of Science Degree in Telecommunications Management degree Prior to enlisting in US Army was perfect fit to be in Communication Signal Corp unit like his Bravo Company which operated Microwave Transmission Systems Operations and Maintenance. Company unit with other company units of 57th Signal Battalion provided signal links to III Corp directly to give the Corp, tools to communicate with Divisions which are assigned to the Corp divisions are units that is larger than

Brigades. Divisions have tanks and artillery with heavy fire power OR many infantry soldiers who specializes in small arms fire suppression team who goes door to door mission to find and kill, search and destroy missions hunting for the enemy forces. Good fit, and US Army recruiter offered to put Plaintiff at E-4 rank. Plaintiff was an E-4 from January 31, 2002 to September 18, 2007, during entire times of military career. Based on, rank maturity, Plaintiff was promotable within 2 years of service period. Within 5 years 9 months of military service. Plaintiff was passed over for promotion 5 times and during those times, offenders of Plaintiff's report of torture remained Plaintiff's supervisors for four years. Remainder years Plaintiff and offenders remained in same company for rest of the times Plaintiff was in military service and Requests for transfer to different company unit was denied several times. Offenders were investigated by Army CID Criminal Investigation Department unit but were not prosecuted.

End of Operation Iraqi Freedom II in December 2004, unit Commander in order to separate the activities of the soldier-offenders NCOs and Plaintiff on return trip to US Soil, separated Plaintiff in a extra-duty to return to US Soil on a cargoship run by merchant marine to ship broken and damaged military equipment like tanks and Blackhawk helicopters gravely damaged back to US Soil. The trip took 30 days aboard the merchant marine cargoship through South Africa from Middle East Gulf, to Atlantic Ocean near Charleston, South Carolina's military ports. Ship arrived and as part of duties, assisted in unloading of vehicles and unchaining them, which the equipment was chained in the rough sea so it may not be moved and cause ship's balance to be off and cause ship to fall over with shifting of weight of cargo. Delicate

balance was kept by soldiers who were assigned to extra-duties on aboard the cargoship.

While Military unit arrived via airplane back to US Soil, and has gone through all the necessary transition training, the late-comers, including Plaintiff went through training without seeing through operating with the unit.

Furthermore, Plaintiff's requests for transfer from unit, request for Inspector General Investigation, CID Investigation, and EO JAG Investigation were lost during transition of chain of command. Company Commander changed command and all sealed documents were either lost or destroyed as unit including Battalion and Brigade expected Disbanding of Units because many soldiers were expected to leave the unit. Those soldiers were being held within the Army during Combat Zone operations to be forced barring retirement, honorable discharge because, authority of Department of Army, making their service necessary deemed mission critical, thus, they were also denied leave from military service. Those were later given opportunity to receive compensation only after going through complicate process the Army offered after military personnel left military, burden on the person filing to prove that they were in fact had been stopped from leaving military service in force by the orders at the time.

Exhaustive ways in which Department of the Army which sets up its own ways to retaliate against through giving unit commanders to decide right from wrong in combat zone or in US Soil provides errors that are hard to work from point of view of victim of crime of sexual misconduct, rape, molestation, battery, torture, and friendly fire.

In U.S. Soil, in Fort Hood Texas, Plaintiff was separated from company unit's regular activities.

When, Plaintiff was in military Friendly Fire was imminent and threatened against Plaintiff. Infractions of military soldiers' criminal activity that are unlawful by military justice or civilian justice are overlooked in times of war and surrounding efforts under the guise to keep unit cohesion in tact.

Even unit commanders would not enforce such thing as pornography materials distributed amongst soldiers by NCO E-5 to even 1st Lieutenant Officer to E-7 level high ranking NCO chain of command unless a person submits an actual paperwork of formal complaint to the chain of command. This puts light to already well-known behavior something that by rules governing military units, to report to higher chain of command in officers ranks. Unreported crimes even known amongst ranks was not punished. Crimes occurring knowingly amongst soldiers long as they cooperate in hiding and none reporting of incident to reporting chain of command, then, rape, adultery, torture, hazing, were only verbally told not to continue by those in immediate chain of command. Usually that means, an NCO Chain of command, E-7 telling E-5 Sergeant to not distribute pornography anymore even after 5 months of distribution and sharing. Because, so many participated, so many are accountable, they hide crimes that affects so many people, which would affect the unit's mission capability if everyone is convicted in Official Manners, unit commander let it slide.

Plaintiff, reported an official complaint to unit commander, of those incidents, and whistleblow criminal activities. Because, to Plaintiff's point of view, it involves the safety and victimizes the people who are not participating.

Criminal activities and those involved retaliate and abuse soldiers who are not participating due to religious belief and self-worth and being victim of hazing torture, sexual battery, assault, would not participate and thus, becomes isolated and mistrusted because those who commit crimes and drink alcohol against base commanding general's order, watch pornographic material and possess and distribute and share amongst close-tides create unstable work environment where multiple people in group gangs up on minority of the group.

In Plaintiff's unit, those E-5 Sergeants hazed lower ranking enlisted soldiers and tortured, sexual assault, and physical battery, and abused rank of which responsibilities that the E-5 rank was holding. Too much power gave them empowered position to use power to abuse those who did not.

Often, E-5 Sergeants those who were immediate supervisors attempted to humor themselves and began calling Plaintiff, a North Korean Spy. They spread rumors and told higher ranking officers and other enlisted soldiers within Bravo Company as well as other company soldiers, that he is a North Korean Spy. Espionage is a treason punishable by death in military justice system and accusation of such is not funny to be spoken of lightly. This method of hazing occurred in Basic Training, MOS Training which happens upon completion of the basic training as designated as advanced job training for military personnel for Plaintiff, being victimized, have reported the occurrence in each time.

On the day when Plaintiff arrived to Fort Hood Texas from Fort Gordon Georgia, hoping to thwart off the bad mojo of already received hazing in two previous forts, Fort Benning, Georgia and Fort Gordon Georgia from units Plaintiff

trained with, including attempted rape in basic training, hazing, physical assault, battery, death threat, Plaintiff was happy to stand in line to unit assignment station with his baggage ready to submit paperworks of transfer of unit. Plaintiff received onslaught of joking from other units members seeing Plaintiff's physical attributes of race, which was apparent racial profiling or racism apparently, soldiers began asking if Plaintiff was a North Korean Spy. Are you from North Korea? Are you a North Korean Spy?

Plaintiff was hazed into the B CO 57th Signal Battalion through several instances from African American NCO's who attempted humor upon Plaintiff, why did you join US Army as enlisted soldier when you have a college degree? Are you dumb? Choice of enlistment and enlistment channel whether officer ranks or enlisted ranks are mare choices made by those who made them. Not to be further engrossed in discussed and hazed and tortured and proved to be absolute truth by those who are co-workers and colleagues of Plaintiff.

Plaintiff was grilled and assaulted while asking same question, every day, Are you a commi? Are you a North Korean Spy? Many soldiers enlisted put hands directly on Plaintiff, battery, assaulting Plaintiff, punching, kicking him, and cornering him in the work place. Hazardous and hazing continued, Plaintiff continue to file informal and formal complaints of those incidents as Plaintiff was assured fair investigation and opportunity to provided equal opportunity through Army's Equal Opportunity Employment Guidelines.

Plaintiff learned as those investigation never resulted in punishment or conviction, rather, those who were performing hazing, received congratulations as

the hazing itself was aggression and behavior that was rewarded and is part of a leadership characteristics that should be commanded and offenders and victims flipped in how soldiers were treated. The offenders joined the NCO ranks and received promotion for behavior and rewarded while the victim of hazing and apparent racial employment discrimination was retaliated by the ranking group E-5 and above. The officially, chain of NCO Command blocked actual formal complaint to reach to the Unit Commander's ears.

Plaintiff had to go see Unit Commander in Basic Training once threatened of attempted rape by group of African American soldiers in Fort Benning Georiga, in order to put space between where training occurred, and had to change training phase to separated from those five people who offended Plaintiff.

Plaintiff had to go see Battalion Commander and E-8 Command Sergeant Major in order to resolve the complaints and matters that didn't reach beyond the NCO Chain of Command within the Company Level in Advanced Job Training (MOS) in Fort Gordon, Georgia where Plaintiff was physically assaulted and death threatened by offenders who Plaintiff observed committing felony. Plaintiff reported to the Company Level NCO Chain of Command and they retaliated by putting Plaintiff in same bunk bed (top bunk) with lower bunk occupied by the offender who threatened and physically assaulting, punching and choking around the neck with immense physical overpowering over Plaintiff. Offender lifted Plaintiff with one hand wrapped around the neck while offender's other hand holding hot iron he was using to Iron his uniform near Plaintiff's face. Two E-6 NCO came in with other soldiers upon hearing Plaintiff and witnesses seeing the struggle broke the two

soldiers, Plaintiff and Offender apart. Plaintiff was forced to share room with the offender because Plaintiff's NCO Chain of command decided to joke that Offender will stop committing felony if Plaintiff was nearby in fact bunk mates where eight to twelve soldiers reside together. After reaching Battalion Command, Plaintiff was reassigned room to different room away from the Offender who death threatened and battery Plaintiff on weekly threats. Pinned between the threats and lack of Chain of Command who acted as such, Plaintiff removed clause in his employment contract with US Army, not to attend the Airborne School (parachuting) and that changed the destination unit which will receive Plaintiff after Fort Gordon Georgia Training School period has ended. Initially after Airborne school Plaintiff was going to be assigned to North Carolina or other airborne unit. The offender who made death threats made death threats to the day of graduation. Plaintiff had to make emergency change thus, removing clause to have Plaintiff attend Airborne school where Offender was also to attend, he said, he will cut off and break equipment in parachuting and make it look like accident and kill Plaintiff.

Plaintiff was shuffled out of Fort Gordon, Georgia, while Offender went on to Airborne School, Plaintiff headed to unit assignment in Fort Hood Texas. Plaintiff was assigned to 57th Signal Battalion where Plaintiff was waiting for company assignment.

That was just three Forts that Plaintiff endured in first year of Military Service in 2002.

When Personnel changes Fort or Base, the unit either destroys records during transfer so the receiving unit of the personnel is not receiving unless

permanent record, not all previous unit's records carries over except the official

transfer orders. New personnel folder is made at the receiving unit with official

diploma of graduation from Basic Training and Job Training School, and military

service contract which shows whether a soldier is contracted to receive certain sign-

up bonus, school GI Bill bonus, school training clause like Airborne Training

(parachuting) or not. Each training adds special pay on top of soldier's regular rank-

based salary or pay. Having additional military skill like airbone school adds about

$150/month to a soldier's salary above and beyond basic rank-based time-in-

service based salary pay. Planitiff lost $150/month to make decision not to go to

airborne school with the offender who constantly hazed and threatened Plaintiff.

Plaintiff suffered about $9000 of pay loss by pulling the clause which would have

opened up additional promotional opportunities as well as payment in the length of

duration of military service.

After arriving, Plaintiff received in succession sign-up bonus and student loan

repayment program bonus. Those clause in military service contract afforded him

Army to pay off Federal Student loans for each year served in US Military service a

portion per year.

Plaintiff spoke Korean Language because Plaintiff was born in South Korea.

Plaintiff grew up in South Korea until when he was about 13 years old. Plaintiff and

his parents and his brother immigrated through legal channels of lottery in US

Immigration System moved to Los Angeles California in 1989. Plaintiff graduated

from high school located in Los Alamitos California with GPA of 3.14. Plaintiff

learned English within 6 months to fluency level enough to take Advanced

Placement (AP) European History and other regular classes of those who were natively speakers of USA born citizen students. Plaintiff attended ESL classes for short time before joining the Regular English classes appropriate for his age, math, history, fine arts, and graduation requirement classes. Plaintiff graduated from college in 3 years with bachelor of science degree in telecommunications management. He applied for MFA Photography program at CSULB in Long Beach California and was accepted but, after seeing US being attacked during 9/11 incidents, joined enlisted military service route to add to his life. Plaintiff was sworn in to serve January 31, 2002.

Back to Fort Hood Texas in 2005, Plaintiff continued to attempt to find administrative ways to exhaust all manners available to Plaintiff by filing complaints through Inspector General's office and other methods available to him and being diligent to do so. Many of the Fort Hood Resources were allocated to two fronts war in Iraq and Afghanistan. Many of the CID as well as JAG were deployed to Iraq with the Corp Commanding unit and were on several different schedule of redeployment back to US Soil or being transitioned as in new personnel were incoming and assigned.

In 2005 after returning, units that deployed in 2004-2005 were given one year on US Soil and were scheduled to deploy to Iraq against in 2006. But, the war ended and Plaintiff's units was disbanded meaning the units dissolved chain of command and assigned personnel to fill the other units which survived being scattered. Many soldiers left the service due to phase out of MOS designation which made them expendable thus, forced to change the MOS and start over the career

they had built on. Promotion only occurs when personnel gains enough points toward promotion such as years in service to be proficient in MOS that is in their military service contract. The MOS points changes if MOS is changed and promotion clock resets.

Plaintiff was on other than MOS missions for several occasions.

Prior to 2004 deployment to Iraq, Plaintiff was assigned to South Korea to participate as Bilingual Interpreter on top of Main MOS, which was Microwave Transmissions Systems Operator, and another duty as Teleconferencing Technician. Unlike Battalion and Company level units, Brigade was much more mobile and can assign or pull personnel from Battalion and Company level to missions that is not unit level such as Ulchi Focus Lens, a joint operation military exercise with South Korean army with US Army and other branches of military. Multi-national exercise was staged centered around US at Fort Hood Texas, South Korean Army in South Korea, and staged live connection to Iraq. Three way live teleconferencing of three different leaderships (Iraq, US, South Korea), was technical marvel of challenges ahead. Plaintiff reported to unit that needed Plaintiff for translation when Generals convened in South Korea for talks negotiating facilitation of the exercise, Plaintiff was chosen to translate and monitor and facilitate as liaison between those in charge of the operations who spoke different language as well as needed to find a way to trust each other.

Pinned between the two armies, Plaintiff suffered great deal of stress but managed and upon successful mission, of command and control via teleconferencing

over satellite communications, Brigade Commander awarded Brigade coins to those who showed excellent merits and performances in front of the entire Brigade.

Plaintiff received such Brigade Coin from Colonel Lynn in 2003. Colonel has been promoted and became Major General in the Army in charge of entire Fort in Arizona in charge of intelligence command.

Plaintiff is telling the Court, the Plaintiff above all diligence to honor and truth and factually served US Army, and received merits in military service and attempting to achieve after using all manners of administrative process to get US Army to pay for suffering regardless of indifference Army has shown Plaintiff for plaintiff's suffering.

Army, has yet to respond with production of the materials as simple as provide opportunity to talk with Bravo Company Commander who sealed the case which Plaintiff filed against offenders in Iraq. There are no known records available to Plaintiff where Captain Freeman was transferred to. There is no online search result showing where Captain Freeman is even after all those years.

Plaintiff, therefore, used different channels of process available to Plaintiff. Plaintiff's location of residence now within Portland Oregon which is far from Fort Gordon Georgia, Fort Benning Georgia, Fort Hood Texas, or Kuwait or Iraq to gain detailed information because those are previlged information protected as national security and inaccessible so, henceforth, Plaintiff is dividing efforts to tackle the situation where he has access to.

Military Medical records were turned to Veterans Affairs when Plaintiff left US Army Service. Thousands of pages were requested from Veterans Affairs for

information some times ago. Veterans Affairs sent on October 24, 2013, notice mail letter stating that they are looking into procuring of those document and may or may not be able to find them and may take 30-60 days to reply to your request. A copy of that letter is attached to this amendment to the original complaint.

Second route in which Plaintiff attempted to get resolution is to get compensation through Army Board of Review called The Department of Defense Disability Board of Review (DoD PDBR), which sent an official letter to Plaintiff stating "reviewed your application and found that your disability rating should be modified but not to the degree that would justify changing your separation for disability with severance pay to a permanent retirement with disability." And on later paragaph the letter stated "This decision is final. Recourse within the Department of Defense or the Department of the Army is exhausted; however, you have the option to seek relief by filing suit in a court of appropriate jurisdiction" on said letter from the Department of the Army, which was signed by Acting Deputy Assistant Secretary named W.A. (Bud) Shatzer of Army Review Boards. The letter is dated August 21, 2013. The initial investigation to this was awaiting Veterans Affairs' investigation into Plaintiff's medical evaluation which is well known to be back logged several years. Plaintiff's case was back logged from September 2007 to 2012, about five years. Because, Army Board of Review was waiting on Medical Evaluation from VA that was waiting on tests performed and investigation of such records as military service records to determine whether applicant has even served in military instead of using military records from Army on face value to say person received injury from combat zone as said-so, took forever to indicate that injuries

were combat related. Once Veterans Affairs determined those injuries were combat related there were when times, Plaintiff worked to include on list of combat related injuries to include Military Sexual Trauma for about four years. It was then determined in this administrative process that Veterans Affairs Disability Compensation department found Plaintiff to have suffered Military Sexual Trauma through investigation into military personnel and medical records and put those diagnosis into Plaintiff's Veterans Affairs medical records. Plaintiff obtained those relevant document certified by Veterans Affairs and submitted to the Department of the Army Board of Review for review process which was allowed by bills passed in Congress because many soldiers received discrimination when they were forced to leave the US Army without Army doing the investigation of proper medical examination of soldier's injuries. Instead it asked Veterans Affairs to complete the tasks. The task often back logged several years delaying the process to get the administrative processes within US Army to proceed forward.

A copy of that Army Review Board's decisions and medical findings are attached to this Amendment to the Original Complaint to cure deficiencies.

Then, the Department of the Army, updated the separation document, and sent an official letter to Plaintiff on September 17, 2013, which states "Your original separation order has been amended, modifying your disability rating to 10% without recharacterization to your separation. A copy of the amendement is enclosed. Your severance pay amount is not affected by this change, because severance pay is not based on your rating."

Immediately following separation of September 19, 2007, Plaintiff had to decide whether to sell the house he owns or face foreclosure. Plaintiff chose to sell the house because, after US Army, he had no income yet faced complete unemployment due to disabilities.

When Veterans Affairs say there are combat related injuries or service connected injuries which adds to the VA Disability Rating, those injuries are permanent when Plaintiff left service and were ongoing resulting in conditions substantially limits Plaintiff's major life activities.

Any and all of the VA Rating given diagnosis and conditions are service-connected which means occurred in during military service, and are affecting Plaintiff's major life activities.

Plaintiff is not white. Plaintiff is Asian. Plaintiff was born in South Korea. Plaintiff performed his job satisfactorily in US Army. Plaintiff was treated differently from similarly situated employees who are not in Plaintiff's race. Plaintiff was hazed based on race class.

Plaintiff suffered disabilities which were from combat related service connected injuries which made Plaintiff suffer with pain and his major life activities were substantially limited by those disabilities from which US Army made decision to end military service for Plaintiff.

Upon further investigation into military service via Veterans Affairs (VA), VA treated Plaintiff for poly trauma, multiple trauma that happened around same time period (that is during military service).

Plaintiff suffers during military service and hence on, suffers from several physical and mental impairment that substantially limits one or more of his major life activities.

Again, Army has not cooperated in providing medical records from military by shouldering the burden that Army's records were transferred to Veterans Affairs immediately prior to Army doing the time to investigate Plaintiff's conditions before forcing plaintiff to involuntarily ending military service when Army found out that Plaintiff's conditions are one of such conditions that Army considers a soldier disabled.

Upon on, Army stopped treatment of Plaintiff's other disabilities that were also found together with the one of the conditions, and only focused on the condition of many and did not list them as part of complex disabilities that Veterans Affairs was shouldered to find and treat for Plaintiff.

Those disabilities that were substantially limiting Plaintiff's life activities during Military Services are combined into Veterans Affairs Disability Rating System. Veterans Affairs Rating System combines multiple disabilities that were incurred during military service and treats them and rates them based on severity of each affecting Plaintiff's major life activities. Then, it adds them using special formula to a percentage scale and gives a total disability rating. That percentage often determines how much severely disabled Plaintiff is. Plaintiff's rating is 90% out of 100%.

Plaintiff has not been able to have gainful employment, because, those disabilities which happened and occurred since and while within during military

service which not only affected Plaintiff's major life activities during military service as well as life after military service as those burden was put on Veterans Affairs and ratings and investigation of medical conditions were submitted back to Administrative Process to a final exhaustion; all available within the Department of the Army.

The process took from September 18, 2007 to September 17, 2013, but, originally, Plaintiff initiated internal Army investigation into finding out details of the determination of sexual assault, hazing, trauma resulting from battery assault and hazing and torture in June 2003. It took over 10 years of exhausting administrative processes within Department of the Army to conclude that Plaintiff has exhausted all available manners of processes.

Thus, making complaint to actually comply to jurisdiction has put enormous suffering on Plaintiff's well being.

Currently, Plaintiff does not have Primary Care Provider with Veterans Affairs. There are many doctors available outside Veterans Affairs who can treat for Plaintiff's conditions, but, those doctors in outside network require other health insurance programs and packages that would put Plaintiff under enormous debts. Because, Veterans Affairs Medical Facilities in factual denied service to Plaintiff because, Plaintiff's medical conditions in combined form, is too complex for medical staff to treat Plaintiff's service-connected medical injuries, Plaintiff has not had Primary Care Provider for over a year and next Primary Care Provider medical examination could be March 2014. This appointment was setup in two years prior in

2012 to replace the past primary care provider who abandoned and moved to State of Texas.

Having a Military Medical Retirement would have afforded money to pay for extra care outside limited and backlogged understaffed Veterans Affairs Medical Facilities and Hospitals. Plaintiff's medical conditions proper doctors and medical care so thereby preventing further suffering by Plaintiff, however, Army wrote off Plaintiff as write-off something that would be more cost-effective to involuntarily discharge Plaintiff upon finding out about the disabilities Plaintiff has because of military service in combat zone, and all those actions illegally committed against Plaintiff by members of the Department of the Army.

Plaintiff suffers disabilities that substantially limits majority of his life activities and those listed below are service-connected meaning from the time while in service.

1) Post Traumatic Stress Disorder with aggravated

2) Obstructive Sleep Apnea

3) Fibromyalgia

4) Biciptal Tendonitis, right shoulder

5) Hallus Valgus with plantar Fasciitis and pes planus, left foot

6) Plantar fasciitis and pes planus, right foot

7) Chondromalacia, right knee s/p surgery

8) Meniscus Tear, left knee

9) Low back strain with L4-L5 disc dessication

10) Seasonal Allergic Rhinitis

11) Hypertension

On-going investigation in Veterans Affairs Disability Compensation,

investigation going on for

1) shin splints, left leg

2) shin splints, right leg

3) right ankle sprain

4) hypertriglyceridemia

5) residuals of cold injury to hands and feet

6) insect bite scars, bilateral legs

7) chest pain

8) acne

9) residuals of closed head injury

10) migraine headaches

11) pervasive developmental disorders

Looking into individual diagnosis in greater details:

1) Obstructive Sleep Apnea is service connected, gulf war, incurred, static
disability, 50% disability rating 12/29/2008

2) Post truamtic stress disorder with aggravated attention deficit
hyperactivity disorder (previously rated as post traumatic stress disorder
with depressive disorder) [Personal Trauma PTSD/Personal Assault],
Service connected, Gult War, Incurred, Static Disability, 50% disability
rating 3/4/2010

3) Fibromyalgia (Claimed as myofascial pain syndrome) [Gulf War Presumptive] [Environmental Hazard in Gulf War/Diagnosed-Biological], Service Connected, Gulf War, Presumptive, Static Disability, 40% disability rating 3/4/2010

4) Bicipital Tendonitis, Right Shoulder (Claimed as residuals of right shoulder injury manifested as pain), Service Connected, Gulf War, Incurred, Static Disability, 20% from 3/4/2010

5) Chondromalacia, Right Knee S/P Surgery with Residual Scars, Service Connected, Gulf War, Incurred, Static Disability (Disability Severance Condition) 10% 9/19/2007

6) Meniscus Tear, Left Knee, Service Connected, Gulf War, Incurred, Static Disability, 10% from 9/19/2007

7) Hallus Valgus With Plantar Fasciitis and Pes Planus Left Foot, Service Connected, Gulf War, Incurred, Static Disability. 10% from 12/29/2008

8) Plantar Fasciitis and Pes Planus, Right Foot with history of Hallux Valgus, Service Connected, Gulf War, Incurred, Static Disability 10% from 12/29/2008

9) Low Back strain with L4-L5 Disc Dessication (Claimed as low back injury and thoracic spine disorder), Service Connected, Gulf War, Incurred 0% from 9/19/2007

10) Seasonal Allergic Rhinitis, Service Connected, Gulf War, Incurred, 0% from 9/19/2007

11)   Hypertension, Service Connected, Gulf War, Incurred, 0% from
      9/19/2007

After several combined evaluation for compensation, Veterans Affairs
determined 70% from 9/19/2007, 80% from 12/29/2008, and 90% from
03/04/2010 and individual unemployability granted from March 4, 2010.

Individual Unemployability (IU) is based on severest disabilities:
PTSD/ADHD, Fibromyalgia, joint/ortho issues that cause chronic pain.

From March 4, 2010, Veterans Affairs determined "Basic eligibility to
Dependents' Education Assistance is granted as the evidence shows you currently
have total service-connected disabilities, with consideration of individual
unemployability, permanent in nature. The effective date is the same date your total
evaluation has been established" which the decision was made in around July 16,
2012 for the evaluation made in March 4, 2010.

While Veterans Affairs denied again, previous denial standing, residuals of
closed head injury, denial of service connection for migraine headaches as
secondary to residuals of closed head injury is confirmed and continued.

The Military Medical Records shows such diagnosis as head injuries such as
concussions. However, when asked to provide Plaintiff's military medical records in
possession of Veterans Affairs department, they were unable to do so to say they
can show Plaintiff copy of that records. Plaintiff has asked Department of the Army
to provide the copy.

Meanwhile, on news article featured on Marine Corp Times page 10 August
26, 2013 issue, by Patricia Kime, pkime@militarytimes.com, wrote in news article

(copy is attached to this Amendment to the Original Complaint); "Eleven months after the Veterans Affairs Department announced it would team with the Pentagon to fund $100 million in concussion and post-traumatic stress research, the government has awarded two contracts for the five-year initiative. President Obama on August 10 announced that the Defense Department and VA are granting $107 million to two groups to study these complex neurological and psychiatric disorders."

In the article, "a survey of troops published earlier this year revealed that nearly 40 percent think getting help for mental health conditions such as PTSD will damage their careers and thus were reluctant to seek it."

Plaintiff during military career sought out help from mental health for PTSD symptoms in during 2004 deployment and was began being treated for PTSD with anti-depressant and counseling and afforded JAG referral from the counseling sessions with medical professional, which resulted in EO complaint formally charging E-5 SGTs who hazed, assaulted Plaintiff, and case being brought up to Plaintiff's Unit Company Commander. And thus far, Plaintiff was suffered with disability discrimination of epic proportion from Department of the Army. Plaintiff suffered damage to his careers in military, and identified and involuntarily discharged with medical reasons.

News article mentions, "To those helping troops and veterans with PTSD and head injuries – some wounded more than a decade ago – progress has been too slow." Plaintiff is one of those who suffered from 2002, 2003, 2004, 2005, 2006, and 2007 during military careers based on disabilities often encouraged by Army to be

treated, upon voluntary recognition and treatment initiated received retaliation and ill-treatment based on the disabilities alone, and for reporting being victim of hazing, assault, sexual assault, battery, death threat, and countless times, being accused of being North Korean Spy and cornered, punched, kicked, isolated, for reasons the chain of command rather isolate the victim in order to stop the person from further being hazed, resulted in loss of opportunities to become promoted to E-5 SGT himself Plaintiff.

News article wrote "A 2008 study by the Rand Corp. think tank indicated that one in five veterans of the wars in Iraq and Afghanistan have PTSD or depression. And, of the more than 250,000 troops who received a traumatic brain injury, 194,600 suffered one or more concussions, or mild TBI."

Plaintiff suffered medically documented three concussions and several mild TBI in combat zone and several more during assaulted by individual attackers during basic combat training, advanced job training, and while during preparation and afterward, treated for concussive injuries like retardation, treated by Speech Therapist for slurred speech, loss of taste and smell, ringing in the ear while in Military Service in Fort Hood, Texas and was diagnosed with Tinnitus.

Those military records were all transferred to Veterans Affairs, and now they claim they may or may not have Plaintiff's medical records from Department of the Army.

PTSD Diagnosis code indicate "Personal Trauma PTSD" and "Personal Assault." This is the diagnosis code for Military Sexual Trauma for Veterans Affairs

as explained by Veterans Affairs Disability Compensation Official from Portland Oregon Office.

Plaintiff is not trying to prove that sexual assault occurred in military in the army career.

Plaintiff is trying to through lawsuit exacting monetary compensation from department of the army which it did not give Plaintiff upon appeals and final Review Board decision not to give, which became Department of the Army's decision not to give Plaintiff an additional compensation nor medical retirement.

Veterans Affairs effectively gave Plaintiff total disability rating. This decision letter (one page) copy is attached to this Amendment to Original Complaint to cure deficiencies.

Plaintiff has been evaluated by another federal agencies that give disability benefits. Social Security has evaluated the Plaintiff extensively and through Administrative Hearing in front of Judge appointed by Social Security Disability Insurance department FOR the conditions of which affects Plaintiff from disabilities that incurred from Military Service in the Army career.

Social Security Disability Insurance ruling says in favor of Plaintiff is suffering permanent injuries that greatly affect majority of life activities and gainful employment of Plaintiff. Currently, Plaintiff is receiving monthly disability payment from Social Security Administration.

Plaintiff included attached Plaintiff's military training records, which shows the dates of training where Plaintiff trained in the Army.

Plaintiff is waiting for Veterans Affairs to procure those Military Medical Records to show for those records that are going to show that Plaintiff's conditions from the times when it occurred and diagnosis charts and its effects.

Of the three E-5 Sergeants who hazed Plaintiff with torture and sexual assaults, one E-5 went on AWOL and never to be heard of again. Two E-5's were both promoted to E-6 after Unit Company Commander Captain Freeman left the unit and relinquished command and left the unit. There was no hearing of what happened to the Captain Freeman. After Battalion level unit disbanded and all the assets distributed and put away, Plaintiff could not find anyone who was once belonged to the Planitiff's army unit Bravo Company 57th Signal Battalion 3rd Signal Brigade III Corp any longer. Investigations from CID halted once Plaintiff was discharged from the Army. In effect, discharging Plaintiff halted all processes of administrative efforts that Plaintiff engaged within inside while being employed as Army Soldier stopped and ended. In effect, Army's effort to discharge Plaintiff has stopped the evidence that compiled into the investigation have been sealed or destroyed. If any left, Plaintiff asked Army to produce such document if any. Army has yet to do so. Plaintiff asked Army's lawyer US Attorney's Office to cooperate in providing such document, and US Attorney has not done so.

Plaintiff currently suffers in addition to Fibromyalgia, another chronic pain diagnosis called Rhuematoid Arthritis which began with Fibromyalgia along the lines of joint pains becoming more severe and affecting majority life activities of Plaintiff, and Plaintiff suffers.

Matter of treatment through Veterans Affairs in mental health stated that diagnosis of Pervasive Developmental Disorder is not considered disabilities from military service.

If agreeing to that effect, then, Plaintiff was born with Pervasive Developmental Disorder which is an autism spectrum disorder.

That means, Plaintiff was a mentally disabled person in military service and hence, Plaintiff was affected by the limits of the disability and made hardship on Plaintiff when Plaintiff was hazed for disabilities which made him different from class of none-disabled people.

Plaintiff negotiated through hardship of military service and nowadays, Plaintiff has memory problems, cannot concentrate well, cannot work with others people in team, and has fear of trusting and Plaintiff becomes fearful of any supervisors and unable to work for a supervisor, because, Plaintiff fears people will take advantage of Plaintiff's disabilities and hazing Plaintiff, sexually assault Plaintiff, physically abuse and batter Plaintiff.

Those fears came alive when Plaintiff attended colleges after military service. Plaintiff was sexually assaulted and institution ignored the signs of bullying. Plaintiff received death threats and confronted physical violence against Plaintiff who was mentally disabled in autism spectrum disorder and cannot defend himself and unable to function well when cornered. Plaintiff has to tell higher authority like Police Officer on Campus Police to decide and investigate and help Plaintiff to have normalizing school environment through college' campus disabled student services office.

As those signs are similar to what Plaintiff did in Military Service, when approached or happened upon situations that Plaintiff is unable to cope or deal with, Plaintiff result to contacting higher authority figure, in those cases EO officers, NCO Chain of Commands, Inspector General, CID investigator, Military Police, US Senators to try find a better resolution to problems Plaintiff was facing.

Plaintiff gravely suffered upon those disabilities Plaintiff had all his life and in addition Plaintiff was gravely suffered discrimination based on Race, as people cornered Plaintiff to accuse Plaintiff of espionage and accused Plaintiff of being North Korean Spy often to haze, and bully Plaintiff's well beings. It greatly affected Plaintiff and Plaintiff had to report official complaints.

Hence, here, Plaintiff filing lawsuit against Department of the Army, because, Veterans Affairs' findings of disabilities that are service connected isn't enough for the Army to provide adequate compensation for long-term health problems which the veterans affairs inadequately effectively provide coverage and treatment for. For those suffering offended upon Plaintiff during military service. Plaintiff filed lawsuit after all the administrative method of 10 years has gone through exhaustion; all the while Army destroyed records of investigation and non-cooperated with Plaintiff to locate witnesses to come forward in the investigation of those friendly against friendly torture.

Plaintiff has yet to provide the torture. Torture was simply, the three E-5 Sergeants colluded and conspired to in effect turn Plaintiff using his disabilities and way his manners were polite, use those to brain wash Plaintiff to use explosive HE grenades afforded to three E-5 Sergeants to wear suicide vest type device and go kill

American US Soldiers in combat zone. Plaintiff reported this after arguing with the hazer's and sexual assaulters and offenders best he can and reported to EO, and that was reported to higher chain of commander. During which Plaintiff wrote letters to US Senators and attempted media to shed light into this atrocities that Plaintiff suffers and suffered as it happened and none came to light of public knowledge.

Plaintiff deserves compensation of what Plaintiff asked for in his original complaint to be paid to Plaintiff by Department of the Army and any additional compensation awarded by Jury of his peers, so this can come to light and Plaintiff can afford treatment that can ease his pain and suffering that never stops and always continuing, chronic pain, and mental health problems like memory loss and narcolepsy which are ongoing investigated by super back logged Veterans Affairs Disability Compensation Department which is delaying release of those to Army Board of Review which will again due to enlightenment of new evidence, Plaintiff feels he can re-challenge the Department of the Army in the Physical Disability Board of Review again.

Meanwhile, Plaintiff continues to suffer.

Suffer gravely affecting major life activities from disabilities from military service in the great US Army, the department of the army.

Hence, to pay for the treatment and life's needs, Plaintiff urges court to not dismiss Plaintiff's case and allow this to move forward to Jury Trial.

By that time, Plaintiff hope to have acquired from veterans affairs all medical document from department of the army which VA said so received from department of the army which it based for providing disability rating, which now it states that it

may or may not be able to find them. Those are absurd as same as words told to Plaintiff by Department of Army which says even if VA says certain medical conditions were service connected, will not provide compensation through administrative methods and sent letter to Plaintiff and leaving for Plaintiff to take action in judicial lawsuit for compensation.

Those are Plaintiff's Amendment to the Original Complaint as a pro-se litigant who has multiple brain injuries and concussive syndrome which affects memory and cognitive part of the brain which affects, sleep, walking, sitting, breathing, eating, crawling, running, and carrying grocery, standing for long period of times like in line waiting for meal at the restaurant, and shopping, and driving as well.

Plaintiff has had national park disabled person's pass, and several states' state park service disabled persons' pass, Department of Motor Vehicles (DMV)'s disabled person's parking permit hanger and disabled person's or disabled veterans' license plate which only given to those who in effect diagnosed by medical doctor to state that person's life's major activities are affected by the conditions that are permanent disabilities.

Plaintiff has those identifications ready to show in court, as he holds at all times, some of those documents in his person. Medicare Part A and B insurance card for 37 years old Plaintiff, which already proves, that Social Security which issues Medicare Card for retired persons or disabled persons, to show Plaintiff has grave physical and mental disabilities as expressed in previous pages of this Amendment to the Original Complaint.

Please, Plaintiff urges the Court to not to dismiss Plaintiff's case against Department
of the Army.

Sincerely,

Parker Michael Knight

     Formerly Hyunseok Michael Oh

45 SE 196th Avenue

Portland, OR 97233

(971) 400-4609